*565 OPINION OF THE COURT
Dan Lamont, J.
Petitioners New York Public Interest Group, Inc. and Evelyn Silva bring this CPLR article 78 proceeding seeking a judgment declaring respondents to be acting in violation of the provisions of ECL 19-0311 (2) (b) and 6 NYCRR 201-6.2 (b) (6), establishing an enforceable schedule by which the Department of Environmental Conservation (DEC) will carry out the requirements of ECL 19-0311 (2) (b) and 6 NYCRR 201-6.2 (b) (6), and awarding the petitioners reasonable attorneys’ fees and other expenses.
The respondents have submitted an answer asserting the following objection in point of law: mandamus is unwarranted in these circumstances. Respondents also request that if the court should impose a schedule upon them, that such schedule be reasonable.
BACKGROUND
In 1970 the United States Congress passed the Federal Clean Air Act “to protect and enhance the quality of the Nation’s air resources so as to promote the public health and welfare and the productive capacity of its population” (42 USC § 7401 [b] [1]). The Clean Air Act delegates primary responsibility for implementing air quality programs to the States (referred to as Title V programs). States cannot have weaker pollution controls than those required by the Federal Government but they are free to adopt more stringent controls.
The United States Congress amended the Clean Air Act in 1990. The amendment required each State to establish a new permit program for sources of air pollution such as factories and power plants. Each State has responsibility for administering its own permit program, provided that the State submits a proposed permit program, to the United States Environmental Protection Agency (US EPA) Administrator for approval and the program is approved. Each facility covered by the program must apply for and obtain a permit that describes the air quality requirements which apply to the facility. The permit must require the facility to perform regular monitoring and public reporting to assure the public and the government that the facility is operating in compliance with the Clean Air Act. Pursuant to the Clean Air Act (CAA), the permit terms can be enforced by the US EPA, by the State and by members of the public under the “citizen suit” provision.
*566 The US EPA regulations require that States establish an operating permit program fee sufficient to cover the direct and indirect costs of the Title V permit program (CAA § 502 [b] [3] [A] [now codified at 42 USC § 7661a (b) (3) (A)]; 40 CFR 70.9). The US EPA has stated that Title V activities be funded solely through permit fees from sources subject to the program. The State Finance Law expressly includes a variety of direct and indirect costs of the operating permit program that are to be funded by such fees.
New York State has enacted legislation requiring DEC to establish regulations for a phased schedule for acting on complete permit applications over a three-year period after the US EPA Administrator approves the operating permit program. DEC promulgated such regulations on March 20, 1996. The US EPA Administrator approved New York State’s operating permit program on December 9, 1996.
As of November 1, 1999, DEC had taken final action on only approximately 21% of all permit applications for existing facilities subject to the Clean Air Act. “Final action” refers to a decision by DEC either to issue or deny issuance of a permit and the permit becomes available for US EPA review following the public comment period. DEC has failed to come anywhere close to completing the permitting schedule established by the statute and its own regulation requiring final action on all permits for existing subject facilities by December 9, 1999.
The instant proceeding was commenced to establish an enforceable schedule by which DEC will carry out the permitting process pursuant to the statute and the regulation. DEC contends that the permit scheduling requirements are not mandatory and that due to a finite amount of monies, various other Clean Air Act activities are being funded before funds are allocated to the permitting process in the exercise of discretion.
DISCUSSION
The court may only grant mandamus to compel where the right to relief is clear and where the action sought to be compelled is an act commanded to be performed by law and involving no exercise of discretion (Matter of Hamptons Hosp. & Med. Ctr. v Moore, 52 NY2d 88, 96 [1981]; Matter of Kupersmith v Public Health Council, 101 AD2d 918 [3d Dept 1984], affd 63 NY2d 904 [1984]). The act sought to be compelled must be ministerial, nondiscretionary, and nonjudgmental, and must be premised upon specific statutory authority mandating perfor *567 mance in a specific manner (Matter of Brown v New York State Dept. of Social Servs., 106 AD2d 740, 741 [3d Dept 1984]).
The following statutes and regulations are at issue herein:
ECL 19-0311 (2), in pertinent part, states:
“In implementing this section, the department shall * * *
“b. notwithstanding the provisions of paragraph i of this subdivision, establish regulations for a phased schedule for acting on complete permit applications. Such schedule shall ensure that at least one-third of such permits shall be acted upon by the department annually over a period of three years after the administrator approves the operating permit program.” (Emphasis supplied.)
6 NYCRR 201-6.2 states: “All title V facility permit applications for existing subject facilities shall be acted upon by the department within three years of approval of the department’s operating permit program by the administrator. The provisions of this section shall apply to existing facilities with regard to filing such applications during this transition period.” (Emphasis supplied.)
6 NYCRR 201-6.2 (b) (6) states: “During this transition period the department shall take final action on at least one third of permit applications annually over a period not to exceed three years from the date that the title V permit program is approved by the administrator.” (Emphasis supplied.)
State Finance Law § 97-oo (3), in relevant part, states: “Monies in the operating permit program account shall be available, following appropriation by the legislature, to pay the reasonable direct and indirect costs of developing and implementing the operating permit program established pursuant to section 19-0311 of the environmental conservation law. Such reasonable direct and indirect costs shall include [various activities set forth in paragraphs (a) through (j)].”
DEC’S main contention is that the various activities contained under State Finance Law § 97-oo (3) are of equal, if not greater, importance than the permitting process itself and that the statutory scheme implicitly grants DEC the discretion to allocate the limited pool of monies generated from the permitting fees to fund the various activities as it sees fit.
While the court is cognizant of the respondents’ contentions regarding which activities provide the most benefit to the public and believes that DEC’S present allocation of resources may well provide the most benefit to the public, the court is also *568 cognizant of the fact that the petitioner and other experts in the field believe that a greater allocation of resources to the permitting process would be more beneficial in the long run. This court need not and will not make any determination regarding which allocation of funds is in the best interests of the public — and would be hard pressed to do so. DEC’s allocation of funds would certainly withstand a rational basis review provided that DEC had the discretion in the first instance. The court’s determination is based entirely upon plain language statutory construction.
This court holds and determines that the language contained within ECL 19-0311 (2) (and the language contained within DEC’s regulations mirroring the statute) is crystal clear and mandates that DEC shall ensure that at least one third of such permits shall be acted upon by the Department annually over a period of three years after the administrator approves the operating permit program. The statute explicitly mandates the creation of a schedule that will ensure that all permits are acted upon over a three-year period (see, Matter of New York Pub. Interest Research Group v Dinkins, 83 NY2d 377, 385 [1994]).
Furthermore, this court does not find any significant distinctions between the instant proceeding and Jiggetts v Grinker (75 NY2d 411, 417 [1990]). The respondents’ contentions that State Finance Law § 97-oo (3) provides them with the discretion to allocate funds to Title V activities other than permitting are determined as entirely without merit and contrary to the explicit language provided by the Legislature. DEC is not authorized to disregard the clear mandates of the Legislature in order to pursue other activities which it believes are more beneficial to the public.
Accordingly, this court holds and determines that mandamus to compel does apply in this case and that the court will issue an order directing the respondents to comply with a remedial schedule. Taking into account the various reasons that DEC believes it should not be subject to a remedial schedule; DEC’s contention that any remedial schedule should be based upon draft permits only, and not require “final action” on permits; and that the petitioner contends that a remedial schedule should require final action on the remaining permit applications by December 9, 2001, this court hereby orders that DEC take final action on all remaining permit applications within two years from the date of this memorandum and judgment. The statute clearly requires final action by DEC on complete permit applications.
*569 CONCLUSION
This court holds and determines that the petition herein should be and the same is hereby granted with costs and the respondents will be required to comply with a remedial schedule. This court orders that DEC take final action on all remaining permit applications within two years from the date of this memorandum and judgment.